FILED
2023 May-15  PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **AMANALI BABWARI,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:21-cv-00895-RDP** |
| | } | |
| **STATE FARM FIRE and CASUALTY** | } | |
| **COMPANY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This action is before the court on (1) the Motion for Summary Judgment filed by Defendant State Farm Fire and Casualty Company ("State Farm") (Doc. # 46), and (2) the Motion for Summary Judgment filed by Plaintiff Amanali Babwari. (Doc. # 47). The motions have been fully briefed. (Docs. # 51; 53) (Defendant's Motion); (Docs. # 50; 52) (Plaintiff's Motion). For the reasons explained below, (1) Defendant's Motion (Doc. # 46) is due to be denied, and (2) Plaintiff's Motion (Doc. # 47) is due to be granted.

## I.     Introduction

This case arises from injuries sustained by Plaintiff on October 10, 2016, when he was shot multiple times by an unknown assailant while leaving work. (Doc. # 34). Plaintiff obtained a consent judgment against his former employers in state court after claiming that their failure to implement adequate security measures led to his attack. (Doc. # 33-9). Now, Plaintiff brings this action against his employers' insurer, State Farm, under Alabama's direct action statute, seeking to satisfy the judgment he obtained. Ala. Code. § 27-23-2; (Doc. # 1). Therefore, the issue presented in this case is whether State Farm has a duty to indemnify its insureds for the judgment

in the underlying action. For the reasons explained in this memorandum opinion, the court finds that it does.

## II.    Background

The court divides its discussion of the relevant facts into four sections. First, the court recounts the events giving rise to Plaintiff's injuries. Second, the court discusses the underlying state action. Third, the court describes the liability insurance policy. Finally, the court addresses the procedural history of this federal action.

### A.    The October 10, 2016 Assault

In 2016, Plaintiff worked at the Pit Stop Grocery, a convenience store and gas station in Birmingham, Alabama. (Doc. # 34 ¶ 3). Defendants Ramzan Jiwani and Younus Saleh owned and operated the Pit Stop by and through their LLC, A.Y.R.S. Food & Fuel (together with Jiwani and Saleh, the "Store Owners"). (*Id.* ¶ 1).

On October 10, 2016, Plaintiff was working the closing shift at the Pit Stop, which lasted from 1:00 P.M. to 11:00 P.M. (*Id.* ¶¶ 4-5). Plaintiff worked alone that evening. (*Id.*).

Around 8:00 P.M., Plaintiff transported a bag of change from the store to his car. (*Id.* ¶ 7). Occasionally, with the Store Owners' permission, Plaintiff would take up to $100 in change from the Pit Stop to his wife so that his wife could use the change in a different convenience store at which she worked.[1] (*Id.*). Plaintiff's wife would give him larger bills in exchange for the cash, and

---

[1] Following the robbery, the Store Owners mistakenly believed that the bag of cash stolen from Plaintiff that evening contained the cash register receipts for the day and that Plaintiff was on his way to deliver the deposit to the bank as part of his job duties. (Doc. # 34 ¶ 18). Because of Plaintiff's severe injuries and hospitalization after the shooting, the Store Owners did not have the opportunity to discuss the deposit with Plaintiff after the robbery. (Doc. # 47 at 10). Accordingly, the Store Owners made a property loss claim with State Farm on October 10, 2016 for what the Store Owners incorrectly believed was the stolen store deposit. (Doc. # 34 ¶ 18). State Farm subsequently paid the claim on January 27, 2017. (*Id.*).

Later, the Store Owners learned that the stolen money in the cash bag was not actually the store's cash deposit, but rather just change that Plaintiff intended to exchange with his wife. (*Id.* ¶ 19). After realizing their mistake, the Store Owners returned the money paid out to State Farm. (*Id.*).

Plaintiff would then either return the cash to the Store Owners or have the amount taken out of his paycheck. (*Id.*). Exchanging the store's change into larger bills was done primarily for the convenience of Plaintiff—and more particularly Plaintiff's wife. (*Id.* ¶ 8). These exchanges were not part of Plaintiff's job duties, and the Store Owners exercised no control over when, where, or how Plaintiff transported the change to his wife. (*Id.* ¶ 9).

After Plaintiff put the change bag into his car around 8:00 P.M., he went back into the store and continued working. At or around 11:00 P.M. Plaintiff's shift ended and he closed the store. (*Id.* ¶ 11). He then left the store via the front door and locked the door behind him. (*Id.*). Plaintiff was not paid for any work after his shift ended at 11:00 P.M. (*Id.* ¶ 12).

After locking up, Plaintiff walked to his car. (*Id.* ¶ 13). Although there were several parking spots directly in front of the store's entrance, Plaintiff did not park in those spots because they were reserved for customers, and the Store Owners told him not to park there. (*Id.* ¶ 6); (Doc. # 46 at 10 ¶ 19); (Doc. # 51 at 5 ¶ 19). Instead, he parked behind a dumpster on the southwest corner of the store's parking lot, directly underneath an inoperable security light on a telephone pole. (Doc. # 34 ¶ 6).[2]

When Plaintiff reached his car, he did not get in through the driver's door because the lock on that door was malfunctioning. (Doc. # 34 ¶ 14). Instead, he entered through the passenger's side door. (*Id.*). As Plaintiff was sitting down in the passenger seat, reaching to unlock the driver's side door, an unknown assailant approached him from behind the dumpster in the area left darkened by the inoperable streetlight. (*Id.* ¶ 15). Before Plaintiff could react, the assailant fired

---

[2] The Store Owners did not own the parking lot. Rather, they leased the entire premises from a company called TNH, LLC. (Doc. # 46 at 9 ¶ 14); (Doc. # 51 at 4 ¶ 14). The leased property, 760 Heflin Avenue East, included a building containing the Pit Stop and a barber shop that was no longer operating. (Doc. # 33-2 at 24-26). There were several parking spaces directly in front of the building, and between the building and the street, there were two gas nozzles under an awning. (*Id.*). There was a fence on the left border of the property, which is where the telephone pole was located and where Plaintiff parked. (*Id.*).

several shots at Plaintiff and told him, "give me all you got." (*Id.*). Plaintiff grabbed the bag of change he had placed in his car earlier in the day and handed it to the assailant. (*Id.*). The assailant grabbed the bag, shot Plaintiff several more times, and then fled the scene. (*Id.*). At least nine bullets hit Plaintiff and lodged inside his body. (*Id.* ¶ 16). Although Plaintiff survived the assault, he was severely injured. (Doc. # 47 at 5).

Before Plaintiff was attacked in October 2016, there had been one other robbery at the Pit Stop since the Store Owners began operating that store in 2015. (Doc. # 33-2 at 9). This robbery occurred in February 2016 but did not result in any injuries. (*Id.*). The Store Owners testified that, other than the robbery in February 2016 and the attack on Plaintiff in October 2016, they were not aware of any other incidents involving violence or threats of violence at the premises. (Doc. # 33-2 at 10); (Doc. # 33-3 at 3).

There were, however, previous occasions where the police were called to the Pit Stop. Plaintiff testified that he called the police about once or twice a week when he was working at the store. (Doc. # 46 at 8 ¶ 10); (Doc. # 51 at 4 ¶ 10). During his deposition, Plaintiff was asked:

> Q. Now, if there was some trouble at the store, just trouble in general, what was the routine, what would you do? In other words, if somebody is loitering around or shouldn't be, you know, there in general, what was the routine that y'all would do?
>
> A. I would assess the situation first.
>
> Q. Yeah.
>
> A. If it was dangerous, I wouldn't go outside, I would simply call 911.
>
> Q. Sure.
>
> A. And if it's not dangerous, I would go out and tell them, you know, leave the premises nicely.
>
> Q. Yeah.
>
> A. And if something I see is escalating or whatever, you know, then I would come in and, you know, just call 911.

4

***

> Q. What were the majority of those calls for? In other words, what prompted you, what was happening, is there a majority of it -- what would be happening that you would call?
>
> A. Arguments outside between two people, drug dealing going on, shooting on the parking lot, or maybe having a fight going on between, you know -- or maybe somebody, you know broke the [gasoline] nozzle or something of that nature.

(Doc. # 33-1 at 11-13).

> Store Owner Younus Saleh was also questioned about these calls:
>
> Q. Any other instances of where -- let's say it like this: Any other instances [other than the two robberies] where the police had to be called to the store?
>
> A. Say normally, generally speaking, we call sometimes if the customer is getting a little, like, aggressive or maybe sometimes it happens. So we had to call the cops to get them to leave and stuff, but never any serious matter.

(Doc. # 33-2 at 9). Additionally, Plaintiff stated that he did not recall any arrests occurring as a result of his calls to police. (Doc. # 33-1 at 12).

Before Plaintiff was attacked in October 2016, he had expressed concern to the Store Owners regarding whether it was safe for him to work the closing shift alone. (Doc. # 46 at 8 ¶¶ 12-13); (Doc. # 51 at 4 ¶ 13). When Plaintiff first began working at the Pit Stop a second employee typically worked with him for at least part of his shift. (Doc. # 46 at 7 ¶ 7); (Doc. # 51 at 3 ¶ 7). By October 2016, the Store Owners were no longer employing an additional person to work the evening shift with Plaintiff. (Doc. # 46 at 8 ¶ 11); (Doc. # 51 at 4 ¶ 11). Plaintiff felt uncomfortable working the closing shift by himself, and he conveyed his reservations to the Store Owners; however, they did not hire an additional employee. (Doc. # 46 at 8 ¶ 12-13); (Doc. # 51 at 4 ¶ 13).

Plaintiff had also requested that the Store Owners repair the inoperative light that he was parked under when he was attacked. (Doc. # 46 at 9 ¶ 16); (Doc. # 51 at 5 ¶ 16). Although the Store Owners did not own the telephone pole, they paid the electricity bill for the entire premises.

5

(Doc. # 46 at 9 ¶ 14); (Doc. # 51 at 4 ¶ 14). The Store Owners never fixed the light as Plaintiff requested. (Doc. # 34 ¶ 6).

B.    **The Underlying Action**

On April 28, 2017, Plaintiff filed suit against the Store Owners and the unknown assailant (as a fictious party defendant) in the Circuit Court of Jefferson County, Alabama, Birmingham Division. *Amanali Babwari v. A.Y.R.S. Food & Fuel, LLC, et al.*, No. CV-2017-901740 (the "underlying action"); (Doc. # 34 ¶ 17); (Doc. # 33-9).

In the underlying action, Plaintiff asserted claims for negligence and wantonness, and for violations of the Employer's Liability Act. (Doc. # 34 ¶ 17). Plaintiff alleged that the Store Owners bore responsibility for the attack because they failed to implement adequate security measures at the Pit Stop. (Doc. # 33-9 at 7). Specifically, Plaintiff challenged the Store Owners' failure to hire a second employee to work the night shift with him, and their failure to fix the inoperable streetlight under which Plaintiff was parked when he was attacked. (*Id.* at 3).

Although State Farm initially provided a defense for the Store Owners under a reservation of rights, on August 7, 2017, it disclaimed all liability and withdrew the defense. (Doc. # 34 ¶ 20).[3] After State Farm withdrew its defense of the Store Owners, the Store Owners no longer had the financial resources to sustain their defense, and they ultimately agreed to a consent judgment with Plaintiff. (Doc. # 47 at 12).

---

[3] State Farm hired attorney Roderick K. Nelson of Spain & Gillon, LLC to represent the Store Owners in the underlying action. (Doc. # 47 at 7). After State Farm disclaimed liability in August 2017, Nelson withdrew from representing the Store Owners in September 2017. (*Id.* at 7-8). On January 5, 2018, the Store Owners' personally-retained counsel forwarded to State Farm a letter from TNH, LLC, the Store Owners' landlord and co-defendant in the underlying action, demanding that the Store Owners indemnify TNH in the underlying action. (*Id.* at 9). Later that same month, State Farm retained Nelson to represent TNH in the underlying action. (*Id.* at 9-10). Nelson filed a motion for summary judgment on behalf of TNH. (*Id.* at 12). The motion was granted, and TNH was dismissed as a defendant. (*Id.*).

On May 23, 2019, Plaintiff and the Store Owners filed a Joint Application for Consent Judgment requesting a judgment of $877,659.66 for Plaintiff. (Doc. # 33-7 at 4). The Application stated:

> The foregoing Judgment is the product of negotiations between and among the parties and it is the desire of the parties to enter into the instant consent judgment to avoid further litigation and the needless use of judicial resources. The parties stipulate as to the amount of this judgment as reasonable under the applicable facts and law given that Plaintiff was shot approximately nine times, incurred approximately $438,829.83 in medical bills and has endured substantial pain, suffering, and mental anguish. As such, the parties request this Court approve and enter this judgment after hearing the law and facts upon which it is based.

(*Id.*). On that same day, the Circuit Court entered a final judgment awarding Plaintiff damages in the requested amount of $877,659.66 against the Store Owners, jointly and severally, due to bodily injuries caused to Plaintiff by the Store Owners. (Doc. # 34 ¶ 21); (Doc. # 33-8). The court approved the consent judgment in a brief order but did not explain the legal basis for the liability. (Doc. # 33-8 at 2).

### C.    The Insurance Policy

In April 2016, prior to the assault on Plaintiff, the Store Owners purchased a business owners insurance policy issued by State Farm, Policy No. 93-BZ-F597-2, (the "policy"). (Doc. # 34 ¶ 2); (Doc. # 33-4). The policy was in full force and effect on the date Plaintiff was injured and at all other times material to this action. (Doc. # 34 ¶ 2). The policy contains the following relevant provisions:

### SECTION II – Liability

**Coverage L – Business Liability**

1. When a Limit of Insurance is shown in the Declaration for **Coverage L – Business Liability**, we will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies.

\*\*\*

7

**2.** This insurance applies:
    **a.** To "bodily injury" and "property damage" only if:
        **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"[.]

(Doc. # 33-4 at 53).

***

## SECTION II – DEFINITIONS

**17.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(*Id.* at 66).

***

## Section II – Exclusions

Applicable to **Coverage L – Business Liability**, this insurance does not apply to:

    **1. Expected or Intended Injury**
        **a.** "Bodily injury" or "property damage" expected or intended to cause harm as would be expected by a reasonable person; or
        **b.** "Bodily injury" or "property damage" which is the result of willful and malicious, or criminal acts of the insured.

***

    **5. Employer's Liability**
        **a.** "Bodily injury" to:
            **(1)** An "employee" or former "employee" of the insured arising out of and in the course of:
                **(a)** Employment by the insured; or
                **(b)** Performing duties related to the conduct of the insured's business[.]

***

    **6. Employment-Related Practices**
        **a.** "Bodily injury" or "personal and advertising injury" to:
            **(1)** A person arising out of any:

***

        **(c)** Employment-related practice, policies, acts or omissions, such as coercion, demotion, evaluation, malicious prosecution, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person[.]

(*Id.* at 55).

### D.    The Direct Action

On May 24, 2021, Plaintiff filed the instant action in the Circuit Court of Jefferson County under Alabama Code Section 27-23-2, seeking to recover the amount of the underlying judgment against the Store Owners from State Farm. (Doc. # 1-1). State Farm removed the case to this court on June 30, 2021. (Doc. # 1). Both parties have filed motions seeking summary judgment. (Doc. # 46); (Doc. # 47).

## III.    Legal Standards

### A.    Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)).

The party seeking summary judgment bears the burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The nature of this responsibility varies, however, depending on whether the legal issues . . . are ones on which the

movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

For issues on which the non-movant would bear the burden of proof, "the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility." *Id.* (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (en banc)). Instead, "the moving party simply may show . . . that there is an absence of evidence to support the non-moving party's case." *Id.* at 1116 (quoting *Four Parcels*, 941 F.2d at 1437-38). Alternatively, it may provide "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Id.* (quoting *Four Parcels*, 941 F.2d at 1437-38). If the movant satisfies this burden, the non-movant must then go beyond the pleadings and present affirmative evidence showing that there is a genuine issue for trial. *Id.* at 1116-17; *Celotex*, 477 U.S. at 324.

In contrast, if the moving party would bear the burden of proof at trial, it "must show *affirmatively* the absence of a genuine issue of material fact" by presenting "credible evidence that would entitle it to a directed verdict if not controverted at trial." *Fitzpatrick*, 2 F.3d at 1115 (alteration omitted) (quoting *Four Parcels*, 941 F.2d at 1438). If the movant meets this burden, the non-moving party must come forward with "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (quoting *Four Parcels*, 941 F.2d at 1438). The moving party will only be entitled to summary judgment if "the combined body of evidence presented by the two parties" is "such that no reasonable jury could find for the non-movant[.]" *Id.* at 1116.

When determining whether the moving party has met its burden, the court must view the evidence in the light most favorable to the non-moving party and must resolve all reasonable doubts and justifiable inferences in the non-movant's favor. *Anderson*, 477 U.S. at 255; *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1314 (11th Cir. 2007). "[A]t the summary judgment stage the

judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### B.      Alabama Code Section 27-23-2

Under Alabama law, when an injured party secures a final judgment against a defendant that is covered by an insurance policy, the injured party is entitled to have the proceeds of the policy applied to satisfy the judgment. Ala. Code. § 27-23-2. When an injured party brings a direct action against an insurer under § 27-23-2, he acquires a vested interest in the insured's rights under the policy and may seek to compel the insurer to pay the judgment. *Travelers Indem. Co. of Conn. v. Miller*, 86 So. 3d 338, 344-45 (Ala. 2011). However, this right is dependent on the rights of the insured under the policy. *St. Paul Fire & Marine Ins. Co. v. Nowlin*, 542 So. 2d 1190, 1194 (Ala. 1988). Thus, the injured party effectively steps into the shoes of the insured and is subject to any defenses that the insurer could raise against the insured. *See Miller*, 86 So. 3d at 344-45; *Nowlin*, 542 So. 2d at 1194.

### IV.    Discussion

Plaintiff brings this action under § 27-23-2, seeking to apply the proceeds of the insurance contract between State Farm and the Store Owners to his judgment against the Store Owners in the underlying action. (Doc. # 1-1). Under § 27-23-2, if State Farm has a duty under the insurance policy to indemnify the Store Owners, then Plaintiff is entitled to recover the proceeds of the policy directly from State Farm to satisfy the judgment. Thus, the issue before the court is whether the policy covers the Store Owners' liability for Plaintiff's injuries.

The interpretation of an insurance contract presents a question of law, and therefore, issues of insurance coverage are properly decided on a motion for summary judgment. *See Safeway Ins.*

*Co. of Ala., Inc. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005); *Nationwide Ins. Co. v. Rhodes*, 870 So. 2d 695, 696-97 (Ala. 2003). In Alabama, the insured bears the burden to establish coverage by showing that his claim falls within the policy, but the insurer bears the burden to prove that an exclusion applies. *Nationwide Mut. Fire Ins. Co. v. David Grp., Inc.*, 294 So. 3d 732, 737 (Ala. 2019) (insured's burden); *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 697 (Ala. 2001) (insurer's burden).

"It is well established . . . that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured." *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.*, 595 So. 2d 1375, 1377 (Ala. 1992). "Likewise, when ambiguity exists in the language of an exclusion, the exclusion will be construed so as to limit the exclusion to the narrowest application reasonable under the wording." *Id.* Exclusions in an insurance policy "must be interpreted as narrowly as possible in order to provide maximum coverage of the insured." *Twin City*, 817 So. 2d at 695.

Nevertheless, at the same time, "in the absence of statutory provisions to the contrary, insurers have the right to limit their liability by writing policies with narrow coverage." *St. Paul Mercury*, 595 So. 2d at 1377. And, when the terms of an insurance contract are clear and unambiguous, a court must enforce the policy as written. *Safeway*, 912 So. 2d at 1143.

When deciding whether a policy provision is ambiguous, the test "is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean." *Rhodes*, 870 So. 2d at 697 (citation omitted). Thus, a court should give the terms of an insurance contract "a rational and practical construction." *Id.* (citation omitted).

State Farm argues that the policy does not apply because Plaintiff's injuries were not caused by an "occurrence" covered by the policy. (Doc. # 46 at 3). State Farm further contends

that, even if there was an occurrence that triggered coverage, multiple exclusions apply. (*Id.*). After careful consideration, the court finds that Plaintiff has shown that his injuries were caused by a covered "occurrence," as defined by the policy and Alabama law. And, the court further determines that State Farm has failed to show that any exclusions apply. Therefore, for the reasons explained below, State Farm has a duty to indemnify the Store Owners for the underlying judgment, and Plaintiff is entitled to recover the judgment directly from State Farm.

### A.   Plaintiff's injuries were caused by a covered occurrence because the assault was an "accident" from the perspective of the Store Owners.

For the reasons explained below, after interpreting the policy terms under Alabama law, the court concludes that the policy applies to bodily injuries that were not subjectively expected or intended by the insureds. Consequently, the policy covers liability for negligence, but not wantonness. Although Plaintiff brought claims for both negligence and wantonness in the underlying action, the court concludes, after careful review of the record, that there is no evidence that would support a finding of wantonness by the Store Owners. Therefore, because the damages awarded in the underlying action necessarily arose from Plaintiff's negligence claim (not any wantonness claim), the judgment is covered by the policy.

### 1.   The policy covers liability arising from the insured's negligence, but not wantonness.

The policy provides that State Farm will pay for damages that its insureds are legally obligated to pay because of bodily injury caused by an "occurrence." (Doc. # 33-4 at 53). The policy defines occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 66). The term "accident" is not defined by the policy. (*Id.*).

Alabama courts define the word accident as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be

reasonably anticipated." *St. Paul Fire & Marine Ins. Co. v. Christiansen Marine, Inc.*, 893 So. 2d 1124, 1137 (Ala. 2004) (citing *Black's Law Dictionary* 15 (7th ed. 1999)); *U.S. Fid. & Guar. Co. v. Bonitz Insulation Co. of Ala.*, 424 So. 2d 596, 572 (Ala. 1982) ("The term 'accident' has been variously defined as something unforeseen, unexpected, or unusual.").

When an insurance policy defines "occurrence" as an "accident" but leaves "accident" undefined, Alabama courts apply a subjective standard, asking whether the injury was intended or expected by the insured. *See Owners Ins. Co. v. Jim Carr Homebuilder, LLC*, 157 So. 3d 148, 155 (Ala. 2014) ("[T]he policy asks whether the injury was intended or fortuitous, that is, whether the injury was an accident.") (citation omitted); *Christiansen*, 893 So. 2d at 1136-37 (defining occurrence as "an accident, event, or continuing condition that results in personal injury or property damage that is neither expected nor intended *from the standpoint of an insured party*") (emphasis added) (citing *Black's Law Dictionary* 1107 (7th ed. 1999)); *Acadia Ins. Co. v. SouthernPointe Grp., Inc.*, No. 17-cv-01368, 2017 WL 5890350, at *4 (N.D. Ala. Nov. 29, 2017) ("Whether a particular result is unexpected, however, turns on the subjective intent of the insured."); *Auto-Owners Ins. Co. v. McMillan Trucking Inc.*, 242 F. Supp. 3d 1259, 1265 (N.D. Ala. 2017) ("[T]he Alabama Supreme Court has made it clear that the crux of the 'occurrence' inquiry . . . should be whether the conduct was intentional.") (citing *Jim Carr*, 157 So. 3d at 155).

Under this standard, an injury is intended "if the insured possessed the specific intent to cause bodily injury to another," and an injury is expected "if the insured subjectively possessed a high degree of certainty that bodily injury to another would result from his or her act." *Ala. Farm Bureau Mut. Cas. Ins. Co. v. Dyer*, 454 So. 2d 921, 925 (Ala. 1984).

Therefore, "accident" includes bodily injury caused by an insured's negligence. *Bonitz*, 424 So. 2d at 571 ("We have previously held that the term 'accident' does not necessarily exclude human fault called negligence."). Alabama law is clear that "the term 'accident' should not be so

narrowly construed as to rule out an occurrence caused by negligence. Indeed, negligence would be the predicate of any likely liability insured against." *Emps. Ins. Co. of Ala. v. Ala. Roofing & Siding Co.*, 271 Ala. 394, 396 (1960) (citation omitted). Moreover, "the presumption in tort and criminal law that a person intends the natural and probable consequences of his or her intentional acts" does not apply in the insurance context, and therefore, "'expected or intended injury' cannot be equated with 'foreseeable injury.'" *Dyer*, 454 So. 2d at 925.

In contrast, injuries caused by an insured's wantonness are not the result of an "accident." *See Barton v. Nationwide Mut. Fire Ins. Co.*, No. 21-11009, 2023 WL 128921, at *6 (11th Cir. Jan. 9, 2023). Under Alabama law, wantonness "cannot exist without a purpose or design." *Ex parte Anderson*, 682 So. 2d 467, 470 (Ala. 1996) (citation omitted). It requires "acting, with knowledge of danger, or with consciousness that the doing or not doing of some act will *likely* result in injury." *Id.* (emphasis added). Thus, satisfying the standard for wantonness under Alabama law necessarily requires proving that "the insured subjectively possessed a high degree of certainty that bodily injury to another would result from his or her act." *Dyer*, 454 So. 2d at 925; *see Ex parte Anderson*, 682 So. 2d at 470.

Consequently, the issue in this case is whether Plaintiff's injuries were the result of the Store Owners' negligence or wantonness. If the Store Owners were merely negligent, then Plaintiff's injuries were an "accident" as defined in the policy, and the policy provides coverage. If, on the other hand, the Store Owners' behavior constitutes wantonness, there was no "accident" and therefore no "occurrence" triggering coverage.

> 2. **Because the underlying action involved claims of both negligence and wantonness, and the consent judgment did not specify the basis for liability, the court must examine the record to determine whether Plaintiff's damages arose from any covered claims.**

As the party seeking coverage, a plaintiff in a § 27-23-2 action bears the burden of proving that the damages awarded in the underlying action are covered by the insurance policy. *David Grp.*, 294 So. 3d at 737; *Pa. Nat'l Mut. Cas. Ins. Co. v. St. Catherine of Siena Parish*, 790 F.3d 1173, 1180 (11th Cir. 2015) (citing *Ala. Hosp. Ass'n Trust v. Mut. Assur. Soc'y of Ala.*, 538 So. 2d 1209, 1216 (Ala. 1989)). When a plaintiff obtains a judgment against an insured defendant after pursuing both covered and non-covered claims, the insurance company is only obligated to indemnify for damages arising from covered claims. *See St. Catherine*, 790 F.3d at 1178 (citing *Town & Country Prop., L.L.C. v. Amerisure Ins. Co.*, 111 So. 3d 699, 710 (Ala. 2011); *Bonitz*, 424 So. 2d at 573-74); *Ala. Hosp.*, 538 So. 2d at 1214-15; *Barton*, 2023 WL 128921 at *5. Therefore, if a plaintiff obtains a judgment after pursuing alternate theories of liability, and under one of those theories there is no coverage under the policy, the § 27-23-2 plaintiff must show that the basis of the judgment was the covered theory. *See St. Catherine*, 790 F.3d at 1178 (citing *Town & Country*, 111 So. 3d at 710; *Bonitz*, 424 So. 2d at 573-74); *Ala. Hosp.*, 538 So. 2d at 1214-15; *Barton*, 2023 WL 128921 at *5. When no jury verdict or final order in the underlying action identifies the specific claims for which damages were awarded, "it is appropriate, under Alabama law, to look to the record . . . in the underlying action to identify the injuries for which the injured party sought damages." *St. Catherine*, 790 F.3d at 1180  (citations omitted); *see Ala. Hosp.*, 538 So. 2d at 1214-15; *Barton*, 2023 WL 128921 at *5; *see also Hartford Cas. Ins. Co. v. Merchs. & Farmers Bank*, 928 So. 2d 1006, 1013 (Ala. 2005) ("An insurer's duty to pay a judgment is determined by analyzing the policy coverage in light of the facts revealed in the underlying action.").

If, after examining the record in the underlying action, a court is unable to determine what portion of the damages, if any, were awarded for covered claims, then the plaintiff has not met his burden to establish coverage. *See Barton*, 2023 WL 128921 at *6; *Ala. Hosp.*, 538 So. 2d at 1215. However, an insurance company is not relieved of its duty to indemnify simply because a plaintiff asserts non-covered claims in the underlying action. Rather, when the facts in the underlying action are irreconcilable with a legal theory asserted in the complaint, the facts, not the mere assertion of the legal theory, determine an insurer's duty to indemnify. *See Tanner v. State Farm Fire & Cas. Co.*, 874 So. 2d 1058, 1066 (Ala. 2003) ("The insured's conduct rather than the allegedly injured person's allegations determine whether the insurer has a duty to indemnify."); *Hartford*, 928 So. 2d at 1012 (no duty to defend because the alleged facts "flatly contradict the allegation of negligence, which was simply dropped into the complaint"); *St. Catherine*, 790 F.3d at 1180-81 (jury's use of general verdict did not preclude coverage because trial record revealed that all of the alleged injuries were caused by an accident).

In *Barton*, homeowners brought a direct action under § 27-23-2 to satisfy an underlying judgment against their contractor for faulty workmanship. 2023 WL 128921 at *1. In the underlying action, the homeowners brought claims of both negligence and wantonness, and the state court granted summary judgment to the homeowners in a brief order, but it did not specify the basis for liability. *Id.* at *5. Because the insurance policy defined "occurrence" as an "accident," the *Barton* court found that the policy did not cover damages resulting from the insured's wantonness. *Id.* at *6. The court then looked to the record in the underlying action to determine whether the judgment was based on the contractor's negligence or wantonness. *Id.* at *5. After examining the record, the court found evidence supporting the homeowners' allegation that the contractor knowingly violated applicable building codes and therefore knew that property damage was a probability. *Id.* Because there was evidence that could support a finding that the

17

contractor acted deliberately, the *Barton* court was unable to determine what portion of the damages awarded by the state court were based on the contractor's negligence versus wantonness. *Id.* at *6. Accordingly, the court held that the homeowners did not meet their burden to establish coverage. *Id.*

Here, unlike in *Barton*, there is no evidence in the underlying action that would support a finding that the Store Owners acted wantonly. (Doc. # 33); (Doc. # 34). In *Barton*, the court found there was record evidence indicating that the contractor knowingly disregarded applicable building codes. 2023 WL 128921 at *6. From that evidence, a reasonable factfinder could infer that the contractor knew or was substantially certain that property damage was likely to result. *Id.* Here, though, the allegedly wanton conduct is the Store Owners' failure to fix an inoperable streetlight and hire a second employee to work the night shift with Plaintiff. (Doc. # 33-9). While deliberately ignoring building codes implies knowledge that property damage is likely to result, failing to change a lightbulb or hire additional employees does not imply knowledge that a violent shooting by an unknown assailant is likely to occur.

And, while there was evidence of prior incidents of criminal activity at the Pit Stop, that evidence is insufficient to establish that the Store Owners knew or should have known that Plaintiff's injuries were a probability. *See New Addition Club, Inc. v. Vaughn*, 903 So. 2d 68, 73 (Ala. 2004) (citation omitted) ("[W]hile prior incidents of criminal conduct can indicate the premises owner or manager had notice that someone on the premises could be harmed by the criminal act of a third person, proof of prior criminal acts does not conclusively establish such notice."). In Alabama, the bar for establishing notice is very high, and "[a] history of sporadic criminal activity in a given area . . . is not enough . . . even if this sporadic criminal activity shows that the specific location is particularly prone to criminal activity." *Emery v. Talladega Coll.*, 688

F. App'x 727, 713 (11th Cir. 2017) (collecting Alabama cases). Moreover, "the particular criminal activity, not just any criminal activity, must be foreseeable." *Vaughn*, 903 So. 2d at 75.

In this case, the record evidence shows that there was only one other robbery at the Pit Stop prior to October 2016, and that single event did not result in any injuries. (Doc. # 33-2 at 9). And, though Plaintiff frequently called the police while working at the Pit Stop, none of those calls resulted in an arrest. (Doc. # 33-1 at 11-13); (Doc. # 33-2 at 9); (Doc. # 46 at 8 ¶ 10); (Doc. # 51 at 4 ¶ 10). This simply is not enough to infer that the Store Owners knew or were substantially certain that their failure to fix a telephone pole light or hire a second employee for the night shift would likely result in a violent attack on Plaintiff. *See Saccuzzo v. Krystal Co*., 646 So. 2d 595, 596-97 (Ala. 1994) (Although, "[i]n the 18 months preceding the shooting of [plaintiff], the police had been called to [defendant's] restaurant more than 160 times," this "extremely high level of criminal activity . . . could not impute knowledge to [the restaurant owner] of the probability of a criminal attack on [plaintiff]."); *Ortell v. Spencer Companies, Inc.*, 477 So. 2d 299, 300 (Ala. 1985) (holding that a convenience store owner's notice of five robberies, one assault with a weapon, one theft, and one burglary on the premises in a three-year period was insufficient to establish that the store owner knew an attack on an employee was a probability); *Emery*, 688 F. App'x at 732 (evidence of a history of criminal activity on campus and prior altercations between students and local residents was not enough to show that the shooting of a student on campus was foreseeable).

Thus, there is no evidence in the underlying action indicating that Plaintiff's injuries were either expected or intended by the Store Owners. Even though Plaintiff asserted a wantonness claim against the Store Owners, the facts in the underlying action are "irreconcilable" with that theory. *See Hartford*, 928 So. 2d at 1012; *Tanner*, 874 So. 2d at 1066. It is undisputed that the Store Owners did not intend for an unknown assailant to assault and severely injure Plaintiff.

Moreover, there is no evidence suggesting that the Store Owners expected Plaintiff's injuries to occur or that they "subjectively possessed a high degree of certainty that bodily injury to another would result" from their inaction. *Dyer*, 454 So. 2d at 925. Therefore, the evidence is undisputed: from the Store Owners' perspective, Plaintiff's injuries were caused by an "accident," and the policy provides coverage unless State Farm proves that an exclusion applies.

**B.      No exceptions to coverage apply.**

State Farm argues that any one of four different exclusions preclude coverage in this case: (1) the Expected or Intended Acts Exclusion; (2) the Willful and Malicious Acts Exclusion; (3) the Employer's Liability Exclusion; and (4) the Employment-Related Practices Exclusion. (Doc. # 46 at 17-28). As the insurer, State Farm would bear the burden at trial to prove that any exclusions apply. *Twin City*, 817 So. 2d at 697. Accordingly, to prevail at summary judgment, State Farm must present credible evidence demonstrating that no reasonable jury could find in favor of Plaintiff on this issue. *See Fitzpatrick*, 2 F.3d at 1116. For the reasons explained below, the court finds that State Farm has not met this burden. Indeed, to the contrary, the court determines that Plaintiff is entitled to summary judgment because no reasonable jury could find that any of these exclusions apply.

**1.      The Expected or Intended Acts Exclusion does not apply.**

The policy states that coverage does not apply to bodily injury "expected or intended to cause harm as would be expected by a reasonable person." (Doc. # 33-4 at 54). This standard is very similar to the definition of "occurrence" discussed by the court above. (*Id.* at 53). However, the language "as would be expected by a reasonable person" indicates that State Farm intended for an objective standard to apply to this exclusion. At the same time, the court is mindful that, in Alabama, "'expected or intended injury' cannot be equated with 'foreseeable injury.'" *Dyer*, 454 So. 2d at 925. Interpreting this exclusion in such a way as to preclude coverage for any objectively

foreseeable injury would effectively withhold coverage for liability arising from negligence and would render coverage illusory. *See Jim Carr*, 157 So. 3d at 155 (declining to interpret an insurance provision in a way that would render coverage illusory); *Finger v. State Farm Fire & Cas. Ins. Co.*, 459 F. App'x 828, 831 (11th Cir. 2012) ("[I]f a policy includes 'limitations or exclusions [that] completely contradict the insuring provisions,' coverage is deemed illusory, and the insurer must cover the insured.") (citing *Shrader v. Emps. Mut. Cas. Co.*, 907 So. 2d 1026, 1033 (Ala. 2005)). A reasonable person applying for insurance coverage would not expect a liability insurance policy to exclude from coverage any liability for foreseeable injuries. *See Rhodes*, 870 So. 2d at 697 (citation omitted). Indeed, an unforeseeable injury is unlikely to result in liability requiring insurance coverage.

Therefore, the court finds that the "rational and practical construction" of this provision is that the policy excludes coverage for injuries expected or intended by the insured party. *See id.* But, instead of asking whether the insured subjectively expected or intended the injuries to occur, the question that should be asked under this provision is whether a reasonable person in the insured's position would have expected the injuries. *See Allstate Ins. Co. v. McCarn*, 471 Mich. 283, 290 (2004) (interpreting a similar policy provision and finding that it requires the court "to determine whether a reasonable person, possessed of the totality of the facts possessed by [the insured], would have expected the resulting injury").

As discussed above, the evidence in the underlying action does not provide any basis for finding that a reasonable person in the Store Owners' situation would have expected the attack or been substantially certain that the attack would occur. Therefore, the Expected or Intended Acts Exclusion does not apply.

### 2.    The Willful and Malicious Acts Exclusion does not apply.

This exclusion precludes coverage for bodily injury "which is the result of willful and malicious, or criminal acts of the insured." (Doc. # 33-4 at 54). The court has previously determined that this exclusion does not apply in this case because "[t]he failure to hire a second employee or to fix any deficiencies in outdoor lighting by the insured does not rise to the level of willful and malicious conduct." (Doc. # 24 at 15) (denying State Farm's Motion for Judgment on the Pleadings (Doc. # 6) and Plaintiff's Motion for Summary Judgment (Doc. # 12)).

### 3.    The Employer's Liability Exclusion does not apply.

Under this exclusion, the policy does not cover bodily injury to an employee of the insured "arising out of and in the course of . . . [e]mployment by the insured; or [p]erforming duties related to the conduct of the insured's business." (Doc. # 33-4 at 55).

To determine the meaning of "arising out of and in the course of," the court looks to the law of workers' compensation for guidance, even though the meaning of the term may vary in the context of different areas of the law.[4] Ala. Code § 25-5-31; *see SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 181 F.3d 1210, 1218 (11th Cir. 1999).

Under Alabama law, "[t]he phrases 'arising out of' and 'in the course of' are not synonymous[.]" *Ex parte Shelby Cnty. Health Care Auth.*, 850 So. 2d 332, 335 (Ala. 2002) (alterations omitted) (quoting *Union Camp Corp. v. Blackmon*, 289 Ala. 635, 639 (1972)). Indeed, "where both are used conjunctively a double condition has been imposed, and both terms must be

---

[4] The term "arising out of and in the course of" may have a different meaning in relation to workers' compensation statutes as compared to that term's use in exclusions referenced in insurance contracts. The policies applicable to both areas of law dictate that "arising out of and in the course of" is more restrictive in the context of insurance policy exclusions. *Compare Nationwide Mut. Ins. Co. v. Thomas*, 103 So. 3d 795, 805 (Ala. 2012) ("Exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and must be construed most strongly against the company that drew the policy and issued it.") *with Ex parte Weaver*, 871 So. 2d 820, 824 (Ala. 2003) (stating that courts are to liberally construe workers' compensation laws in favor of their "beneficent purpose").

satisfied[.]" *Id.* An injury arises out of an injured party's employment when there is a causal relationship between the employee's performance of his job duties and the injury. *Id.* at 336. "An injury to an employee arises in the course of his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incident to it." *Id.*

The general rule under Alabama Workers' Compensation law is that an accident that occurs while an employee is traveling to or from work does not arise out of and in the course of employment. *Hughes v. Decatur Gen. Hosp.*, 514 So. 2d 935, 937 (Ala. 1987). However, an exception applies "when an employee, during his travel to and from work, is engaged in some duty for his employer that is in furtherance of the employer's business." *Ex parte Shelby*, 850 So. 2d at 336; *see Hughes*, 514 So. 2d at 937.

In this case, the undisputed facts show that Plaintiff's injuries did not arise out of his employment, nor was Plaintiff injured in the course of his employment. At the time Plaintiff was attacked, he had finished his shift and was not on the clock. (Doc. # 33-4 ¶¶ 10-13). Moreover, Plaintiff was not performing any work-related duties. (*Id.*). While Plaintiff did have a bag of change from the store in his car when he was attacked, his reason for having the change was personal: he intended to take the change to his wife so that she could use it in the convenience store where she worked. (*Id.* ¶¶ 7-9). It is undisputed that this practice was done (or permitted) primarily for the convenience of Plaintiff's wife rather than anything related to Plaintiff's work or for the benefit of the Store Owners; that it was not within any duty assigned to Plaintiff by the Store Owners; and that the Store Owners exercised no control over when, where, or how Plaintiff transported the change bag to his wife. (*Id.*). Therefore, at the time Plaintiff was injured, he was not "within the period of his employment," nor was he "engaged in some duty for his employer that [was] in furtherance of the employer's business." *Ex parte Shelby*, 850 So. 2d at 336.

The only connection between Plaintiff's injuries and his employment is that he was attacked after leaving work and while still on property leased by his employer. (Doc. # 34). But this alone is insufficient to support a finding that Plaintiff was injured during the court of his employment. *See Ex parte Strickland*, 553 So. 2d 593, 595 (Ala. 1989); *Pollock v. Girl Scouts of S. Ala., Inc.*, 176 So. 3d 222, 231 (Ala. Civ. App. 2015). In *Ex parte Strickland*, an employee returned to his workplace after hours to retrieve tools, and he was injured while climbing his employer's fence to leave. 553 So. 2d at 595. The court found that his injuries occurred within the course of his employment because he was retrieving tools he needed for work at a different job site the following day. *Id.* Therefore, the determinative factor was that the employee was performing a work-related task, not that he was on his employer's property. *Id.* Likewise, in *Pollock*, the court found that a camp counselor who was injured on her employer's property during a horseback ride was not injured within the course of her employment because the horseback ride was a voluntary activity that was unrelated to her job duties. 176 So. 3d at 230.

Here, although Plaintiff was injured while on property leased by his employer, he was not injured in the course of his employment because he was not performing any work-related tasks. *See id.*; *Ex Parte Strickland*, 553 So. 2d at 595. As such, the Employer's Liability Exclusion does not apply.

### 4.      The Employment-Related Practices Exclusion does not apply.

This provision applies to injuries arising out of an employer's refusal to employ, a termination decision, or some other employment-related practice, "such as coercion, demotion, evaluation, malicious prosecution, reassignment, discipline, defamation, harassment, humiliation or discrimination." (Doc. # 33-4 at 55). The court has already determined that "[t]he actions underlying the current dispute -- an employee being assaulted by a third party in an adjacent parking lot -- are beyond the scope of this exclusion." (Doc. # 24 at 13) (denying State Farm's

Motion for Judgment on the Pleadings (Doc. # 6) and Plaintiff's Motion for Summary Judgment (Doc. # 12)).

## V.     Conclusion

For all of these reasons, the Rule 56 evidence is undisputed: Plaintiff has demonstrated that the injuries he sustained during the assault at the Pit Stop were caused by a covered "occurrence" because the Store Owners neither expected nor intended to injure Plaintiff. Because the undisputed evidence also shows that no exclusions to coverage apply, State Farm has a duty to indemnify the Store Owners for the underlying judgment, and Plaintiff is entitled under § 27-23-2 to recover the amount of the consent judgment from State Farm directly. Therefore, Plaintiff's Motion for Summary Judgment (Doc. # 47) is due to be granted, and State Farm's Motion for Summary Judgment (Doc. # 46) is due to be denied. A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this May 15, 2023.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE